# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. Action No. 23-0190 (ABJ) |
| ASHLEY GAUSE, | ) | |
| D'MARRELL MITCHELL, | ) | |
| TERRANCE BRANHAM, | ) | |
| DEAUNDRE BLOUNT, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Defendants have moved to suppress records obtained from four cell phone providers pursuant to four substantially similar search warrants. *See* Def. Mitchell's Mot. to Suppress Tower Dump Records [Dkt. # 167] ("Mot.").[1]  The warrants sought information, referred to by the parties as "tower dump" records, that identified all devices that interacted with the cell phone tower in the location associated with each of six individual robberies on that robbery's specific date and time. Mot. at 1.  Defendants' motion is premised on *Carpenter v. United States,* 585 U.S. 296 (2018). *See* Mot. at 1–2.  In that case, the Supreme Court found that the government's acquisition of cell-site records that provided it with a "comprehensive chronicle of the user's past movements" over a period of several months was a "search" deserving of protection under the Fourth Amendment, for which a warrant based on a showing of probable cause was necessary. *Id.* at 300, 315–16. While this case is easily distinguished from *Carpenter*, the Court need not address the preliminary

---

1       Defendants Gause, Branham, and Blount have each joined Mitchell's motion, *see* Mot. for Joinder [Dkt. # 169] (Branham); Mot. for Joinder [Dkt. # 170] (Blount); Mot. for Joinder [Dkt. # 172] (Gause), and the matter is fully briefed. *See* Gov.'s Opp. to Mot. [Dkt. # 199] ("Opp."); Reply in Supp. of Mot. [Dkt. # 211] ("Reply").

question of whether the request for a more limited set of information here was a "search," since in this case, the government obtained the search warrants that were absent in *Carpenter*. The only question that remains is whether the warrant applications were deficient in some way.

On November 25, 2020, Special Agent Erik Potrafka of the F.B.I. applied for four warrants to search "information associated with particular cellular towers" stored at AT&T, Sprint, T-Mobile, and Verizon. *See* App. for Warrant, Ex. A to Opp. [Dkt. # 199-1] ("AT&T Warrant") at 1; App. for Warrant, Ex. B to Opp. [Dkt. # 199-2] ("Sprint Warrant"); App. for Warrant, Ex. C to Opp. [Dkt. # 199-3] ("T-Mobile Warrant"); App. for Warrant, Ex. D to Opp. [Dkt. # 199-4] ("Verizon Warrant").

Attachment A to each application identified the property to be searched as "[r]ecords and information associated with communications to and from" six cellular antenna towers during specific time frames on November 6, 9, 11, 12, and 17, 2020:

| Cell Towers | Dates | Times (EST) |
|---|---|---|
| The cellular towers that provided cellular service to 721 D St. SE, Washington, D.C. 20003 38.883606, -76.99529 | November 6, 2020 | 2:10 PM – 2:40 PM EST |
| The cell towers that provided cellular service to 5252 Wisconsin Ave. NW, Washington, D.C. 20015 38.958897, -77.085181 | November 9, 2020 | 1:05PM – 1:40 PM EST |
| The cell towers that provided cellular service to 2460 Market St. NE, Washington, D.C. 20018 38.921108, -76.954954 | November 11, 2020 | 11:10AM – 11:35AM EST |

| | | |
|---|---|---|
| The cell towers that provided cellular service to 2027 North Capitol St. NE, Washington, D.C. 20002 38.917758, -77.008719 | November 11, 2020 | 11:30AM-12:00PM EST |
| The cell towers that provided cellular service to 7311 Macarthur Blvd., Bethesda, MD 20816 38.968783, -77.139 | November 12, 2020 | 7:45PM – 8:10PM EST |
| The cell towers that provided cellular service to 5301 Wisconsin Ave. NW, Washington, D.C. 38.968783, -77.139 | November 17, 2020 | 5:50PM – 6:10PM EST |

*See, e.g.*, Attach. A to AT&T Warrant [Dkt. # 199-1] ("Attach. A") at 4–5. Attachment B to the warrants called for the cellular service providers to disclose certain categories of information about the communications transmitted through the cell phone towers during the corresponding time frames, including:

> a. the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");
>
> b. for each communication, the "sector(s)" (i.e. the face(s) of the tower(s)) that received a radio signal from the locally served wireless device;
>
> c. the date, time, and duration of each communication;
>
> d. the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device); and

3

> e. the type of the communication transmitted through the tower (such as phone call or text message).

*See, e.g.*, Attach. B to AT&T Warrant [Dkt. # 199-1] ("Attach. B") at 6–7.

In the affidavit in support of the warrant, the agent explained:

> Based on my training and experience and the above facts, information obtained from cellular service providers such as Sprint, T-Mobile, AT&T, and Verizon that reveals which devices used a particular cell tower (and, where applicable, sector) to engage in particular communications can be used to show that such devices were in the general vicinity of the cell tower at the time the communication occurred. Thus, the records described in Attachment A will identify the cellular devices that were in the vicinity of (1) 721 D St. SE, Washington, D.C. November 6, 2020 from 2:10 PM to 2:40 PM EST; (2) 5252 Wisconsin Ave. NW, Washington, D.C. November 9, 2020 from 1:05 PM to 1:40 PM EST; (3) 2460 Market St. NE, Washington, D.C. November 11, 2020 from 11:10 AM to 11:35 AM EST; (4) 2027 North Capitol St. NE, Washington, D.C. November 11, 2020 from 11:30 AM to 12:00 PM EST; (5) 7311 Macarthur [B]oulevard, Bethesda, MD November 12, 2020 from 7:45 PM to 8:10 PM EST, and (6) 5301 Wisconsin Avenue NW, Washington, D.C. on November 17, 2020 from 5:50PM to 6:10PM EST. This information, in turn, will assist law enforcement in determining which person(s) were present for multiple robberies and armed robberies in Washington, D.C. and Maryland.

Aff. in Supp. of App. for A Search Warrant [Dkt. # 199-1] ("Potrafka Aff.") ¶ 67. Importantly, the affiant assured the Magistrate Judge that "[t]he government will seize only information relevant to phones that used more than one tower identified by the government." *Id.* ¶ 68.

## LEGAL STANDARD

Pursuant to *Illinois v. Gates,* 462 U.S. 213, 238–9 (1983), the task of an issuing magistrate is to make a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit supporting a request for a search warrant, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The duty of a reviewing court, on the other hand, is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed, *Gates*, 462 U.S. at 236, and a magistrate's probable-cause

determination is given "great deference" on review. *United States v. Spencer,* 530 F.3d 1003, 1006 (D.C. Cir. 2008), quoting *Gates*, 462 U.S. at 236.

A valid search warrant must describe the place to be searched and the persons or things to be seized with particularity. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Therefore, the affidavit must provide "reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 (1978). In other words, it must set out "a reasonable basis to infer" that relevant evidence will be found in the premises to be searched. *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993).

Moreover, pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978), an affidavit supporting a search warrant is afforded the presumption of validity. *Id.* at 171. Defendants may not go beyond the face of the affidavit and cross examine the officer to challenge its veracity in an evidentiary hearing unless they make a substantial preliminary showing that a false statement was included in the affidavit knowingly and intentionally, or with reckless disregard for the truth, and that the allegedly false statement was necessary to the finding of probable cause. *Id.* at 155–56. Defendants do not attempt to make such a showing in this case.

## ANALYSIS

In *United States v. Miller*, the Supreme Court held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties. 425 U.S. 435, 443 (1976). The case arose when the government subpoenaed the defendant's banks, seeking several months of canceled checks, deposit slips, and monthly statements. *Id.* at 437–38. The Court rejected a Fourth Amendment challenge to the records collection for two reasons. First, the defendant could "assert neither ownership nor possession" of the documents because they were

5

"business records of the banks." *Id.* at 440. And second, the nature of the records meant that the defendant possessed a limited expectation of privacy in them because the checks were "not confidential communications but negotiable instruments to be used in commercial transactions," and the bank statements contained information "exposed to [bank] employees in the ordinary course of business." *Id.* at 442. Therefore, the Court concluded that the defendant had "take[n] the risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the Government." *Id.* at 443.

The Supreme Court applied the same principle three years later in *Smith v. Maryland*, 442 U.S. 735 (1979). In that case, the Court held that the government's use of a pen register – a device that recorded the outgoing phone numbers dialed on a landline telephone – was not a search for which a warrant was necessary. *Id.* at 745–46. The Court observed that a pen register is a tool of "limited capabilities," and it "doubt[ed] that people in general entertain any actual expectation of privacy in the numbers they dial." *Id.* at 742.

Defendants contend that these longstanding authorities illustrating the "third-party doctrine" do not govern the situation here. Mot. at 8. They maintain that this case is controlled instead by the Supreme Court's later decision in *Carpenter v. United States,* 585 U.S. 296, and that, following its guidance, the evidence obtained from the cell service providers should be suppressed. *Id.*

In *Carpenter*, the prosecutors applied for orders to obtain information from cell service providers under the terms of the Stored Communications Act in effect at the time, which required the Government to show "reasonable grounds" for believing that the records were "relevant and material to an ongoing investigation." 585 U.S. at 301–02, quoting 18 U.S.C. § 2703(d). They obtained the orders directing two cell phone carriers to disclose cell/site sector information, or

CSLI, for Carpenter's phone, showing where it was when calls originated and when they terminated, for both incoming and outgoing calls, during a four-month period in which a series of armed robberies had occurred. *Id.* at 302. The first order covered a period of 152 days and the second covered an additional seven days; "[all] together the Government obtained 12,898 location points cataloging Carpenter's movements – an average of 101 data points per day." *Id.*

The Court found that the situation was not governed by the principles concerning third party records set out in the *Miller* and *Smith* opinions, and that a warrant based on probable cause was necessary. 585 U.S. at 309, 316. But it took pains to emphasize that its decision was "a narrow one." *Id.* at 316.

> We do not express a view on matters not before us: real-time CSLI or "tower dumps" (a download of information on all the devices that connected to a particular cell site during a particular interval). We do not disturb the application of *Smith* and *Miller* or call into question conventional surveillance techniques and tools, such as security cameras. Nor do we address other business records that might incidentally reveal location information.

*Id.*

Given the marked difference between the privacy concerns implicated in the *Carpenter* case and the warrants here, and the fact that the opinion of the Court specifically carved "tower dumps" out of *Carpenter's* reach, *id.*, it is not at all clear that the Supreme Court would find the request for real time cell tower information in this case to be a "search."

Defendants' characterizations of the warrants provide an inaccurate picture of what was requested and what was received in this case. According to their motion:

> [E]ach warrant application sought data for devices connecting to the towers serving the six robbery locations identified for a combined total of 165 minutes. In other words, the Government sought data from the four cellular providers for a total of 660 minutes – or more than 11 hours – for every device connecting to any of the towers serving those locations, including detailed location data from the "sector" information.

Mot. at 2. With this calculation, defendants suggest that their phones – and therefore, their locations – were being tracked for eleven hours. *Id.*

But the warrant did not seek data about one phone for eleven hours; it sought data from each cell tower for a 30-minute period on November 6, 2020; a 35-minute period on November 9, 2020; 25-minute and 30-minute periods on November 11, 2020; a 25-minute period on November 12, 2020; and a 20-minute period on November 17, 2020. Attach. A at 1. That adds up to a total of only 165 minutes, or about 2 hours and 45 minutes from any one tower, spread over six different dates. A single cell phone would only be communicating with one of the four cell service providers, so multiplying 165 by 4 is both irrelevant and misleading.

In addition, the warrant only ordered the provider to disclose whether any particular phone "pinged" a particular tower during one or more of the very short 20-to-35-minute time frames; the warrant sought zero information as to where the phone went from there. Finally, the Special Agent averred that the F.B.I. would only seize information relevant to phones that communicated with more than one of the towers identified – that is, it was seeking cell phone subscription information only to help identify the people, if any, who were present in the vicinity of more than one of the robberies at the specific times of those robberies.

In sum, defendants' complaint that "these warrants effectively authorized the Government to go digging through the data of every cellular device of every single individual near the crime scenes in the vain hope of finding someone . . . guilty," Mot. at 11, is hyperbolic and inaccurate.

8

The only "data" to be disclosed were which phones were used in one of the particular locations during one of those very narrow time frames, and then the F.B.I. only sought to seize that information if the same phone was found at more than one of the relevant locations during the narrow relevant time frame on each relevant date.

The instant situation cannot be compared to ongoing surveillance, such as the installation of a GPS tracking device on the defendant's vehicle for 28 days which prompted five of the justices in *United States v. Jones,* 565 U.S. 400, 402–03 (2012), to agree that "longer term GPS monitoring . . . impinges on expectations of privacy." *Id.* at 430 (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring). *See also id.* ("[S]ociety's expectation has been that law enforcement agents and others would not – and indeed, in the main, simply could not – secretly monitor and catalogue every single movement of an individual's car for a very long period."). This case cannot be compared to *Jones,* or to the situation in *Carpenter* – "the ability to chronicle a person's past movements through the record of his cell phone signals," which the Court likened to the GPS tracking in *Jones. Carpenter*, 585 U.S. at 309. "Much like GPS tracking of a vehicle, cell phone location information is detailed, encyclopedic, and effortlessly compiled." *Id.*

9

The problem in *Carpenter* was not the disclosure of location information at a point in time; it was, as in *Jones,* the monitoring for an extended period of time. *See* 585 U.S. at 315 ("This case is not about 'using a phone' or a person's movement at a particular time. It is about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years.").[2]

Indeed, the Court found the circumstances even more problematic than those presented in *Jones.*

> A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales. Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.

---

2       The D.C. Circuit recently underscored this observation in *United States v. Green*, No. 23-3100, 2025 WL 2314662 (D.C. Cir. Aug. 12, 2025), when it distinguished information gathered from a stationary pole camera from the "search" in *Carpenter*:

> The cell-site location data in *Carpenter*, like the GPS data in *Jones*, "provide[d] an all-encompassing record of the holder's whereabouts," revealing "not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Carpenter*, 585 U.S. at 311, quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring). Those kinds of data have a "retrospective quality" that allows the government to reconstruct a suspect's past – surveilling him before he was ever a suspect – and to access "a category of information otherwise unknowable." *Id.* at 312.

*Green*, 2025 WL 2314662, at *8. The Court of Appeals then held that the use of the pole camera that captured Green's activities was not a "search" under the Fourth Amendment. *Id.* at *9. The Circuit also noted that *Carpenter* left the Supreme Court's holding in *United States v. Knotts*, 460 U.S. 276 (1983) – that using a more "rudimentary tracking" device that simply "augmented visual surveillance" for discrete intervals was not a search – "undisturbed." *Id.* at *7, quoting *Carpenter*, 585 U.S. at 306. Like the pole camera footage in *Green*, the tower dump records in the instant case concern only "discrete intervals," rather than an all-encompassing view, of defendants' movements.

*Id.* at 311–12 (internal citations omitted). This takes the instant case far out of the *Carpenter* paradigm, and defendants have pointed to nothing that indicates the Supreme Court would broaden the fact-based, "narrow" Fourth Amendment analysis employed in *Carpenter* to the case at hand.

The scope of what the requested data would include was another fact that animated the Court's decision to reject the suggestion that the defendant had parted with it voluntarily.

> Virtually any activity on the phone generates CSLI, including incoming calls, texts, or e-mails and countless other data connections that a phone automatically makes when checking for news, weather, or social media updates. Apart from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data. As a result, in no meaningful sense does the user voluntarily 'assume[] the risk' of turning over a comprehensive dossier of his physical movements.

585 U.S. at 315 (edit in original), quoting *Smith*, 442 U.S. at 745.

The concerns underlying the decision in *Carpenter* are not present here, and that is why other courts have found that tower dump information does not fall within the scope of the Fourth Amendment. *See United States v. Pricop*, 775 F. Supp. 3d 1036, 1039 (D. Ariz. 2025) (holding that *Carpenter* does not extend to tower dump data because the type of data sought is distinct in multiple respects, including the limited nature of the surveillance); *United States v. Williams*, 741 F. Supp. 3d 642, 651 (E.D. Mich. 2024) (same); *United States v. Walker*, No. 2:18-CR-37-FL-1, 2020 WL 4065980, at *7–*8 (E.D.N.C. July 20, 2020) (same).

Defendants point to the Fifth Circuit's opinion in *Smith v. United States*, 110 F. 4th 817 (5th Cir. 2024), to argue otherwise. Mot. at 10–11. In that case, the panel relied on *Carpenter* to compare what are known as "geofence warrants" to general warrants, which are categorically prohibited under the Fourth Amendment:

> Unlike a warrant authorizing surveillance of a known suspect, geofencing is a technique law enforcement has increasingly utilized when the crime location is known but the identities of suspects [are] not. Thus, geofence warrants effectively "work in reverse" from traditional search warrants. In requesting a geofence warrant, "[l]aw enforcement simply specifies a location and period of time, and, after judicial approval, companies conduct sweeping searches of their location databases and provide a list of cell phones and affiliated users found at or near a specific area during a given timeframe, both defined by law enforcement."

*Id.* at 822 (edits in original) (internal citations omitted). The Fifth Circuit viewed the technique as presenting "the exact sort of 'general, exploratory rummaging' that the Fourth Amendment was designed to prevent." *Id.* at 837, quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). This is because, with a geofence warrant, "law enforcement cannot obtain its requested location data unless Google searches through the entirety of its [location history database] – all 592 million individual accounts – for *all* of their locations at a given point in time." *Id.* In other words, "[w]ith 'just the click of a button,' the government can search the pinpoint locations of over half a billion people with [l]ocation [h]istory enabled." *Id.* at 833, quoting *Carpenter*, 585 U.S. at 311. *See also id.* at 834 ("Of particular concern is the fact that a geofence will retroactively track anyone with [l]ocation [h]istory enabled, regardless of whether a particular individual is suspicious or moving within an area that is typically granted Fourth Amendment protection.").

Whatever the problems surrounding geofence warrants may be, the Fifth Circuit's decision in *Smith* is both not binding on this Court and inapposite. A tower dump does not provide law enforcement with the sweeping information enabled by a geofence warrant but, rather, a circumscribed collection of phone locations in a set period of time. It is therefore more akin to a

pen register or a business record, for which a warrant is not required to conduct a general search.[3] But there is no need to wade into the question of whether a tower dump search falls under the umbrella of the Fourth Amendment because, here, the F.B.I. acted in an abundance of caution and did what such a finding would require: it obtained a warrant.

Confronted with that fact, defendants can find little that is objectionable about the warrant application. Defendants do not point to any of the factors set out in *Franks v. Delaware* that would authorize the Court to go behind the affidavit; their motion comes down to a claim that the evidence should be excluded because the warrant was not particularized as to *them, see* Mot. at 10–11, citing *Ybarra v. Illinois,* 444 U.S. 85 (1979), and the search was therefore improper.

Defendants' suggestion that the F.B.I. should not have been able to obtain a warrant for information that was not directed at anyone in particular seems inconsistent with the fundamental contention of their motion: that the request to the cell service providers was an invasion of their personal privacy in the first place. But even if one were to assume that the limited cell tower information sought here implicates privacy considerations that trigger application of the Fourth Amendment, the F.B.I. did what would have been necessary in accordance with constitutional principles: it set out with clarity and specificity what it was seeking to search, what it planned to seize, and why, and it set out probable cause to believe that the information would be found in that location. Therefore, it overcame the low hurdle established by *Illinois v. Gates* and its progeny.

The fact that the warrant did not name anyone in particular does not render it deficient, and the case defendants rely on for that proposition says nothing of the sort.

---

3      For this reason, the Court disagrees with the district court in *United States v. Spurlock*, 778 F.Supp.3d 1136 (D. Nev. 2025), which relied on *Carpenter* and *Smith* to hold that tower dump warrants are indistinguishable from geofence search warrants and are therefore "general" warrants prohibited by the Fourth Amendment. *Id.* at 1145.

In *Ybarra,* the police obtained a warrant to search a premises, but it also included authorization to search a suspect whom police had reason to believe would be there. 444 U.S. at 88. While they were executing the warrant, the officers also searched Ybarra, who was not the person identified in the warrant. *Id.* at 88–89. The Court found that the warrant permitting the search of the suspect did not automatically extend to everyone on the premises, and that the search was unreasonable. 44 U.S. at 91. "A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* Defendants are correct that, in its analysis in *Ybarra,* the Court said, "search or seizure *of a person* must be supported by probable cause particularized with respect *to that person*." *Id.* (emphasis added). But the government did not seek, and the warrants for cell phone tower information here did not authorize, the search or seizure of any person. Therefore, *Ybarra* is entirely inapposite.

The application here was sufficient to show what it had to show: that there was a fair probability that evidence of a crime would be found in the particular place to be searched. The Constitution does not require that the F.B.I. must know who it is looking for before it conducts an investigation to find that out. Moreover, in the unlikely event the warrant was defective as a matter of law, the F.B.I. was entitled to rely in good faith upon the judgment of the Magistrate Judge. *See United States v. Leon*, 468 U.S. 897, 921 (1984). Since the defendant has not pointed to any circumstances that would support a finding that the issuing judge was misled by information in the affidavit that the affiant knew was false, that the Magistrate Judge abandoned her judicial role or neutrality, that the affidavit was so lacking in indicia of probable cause to make reliance unreasonable, *id.,* or that a reasonably well-trained officer would have known the search was illegal, *see id.*; *Herring v. United States*, 555 U.S. 135, 145 (2009), the remedy of suppression would be inappropriate in this case.

14

**CONCLUSION**

For all of these reasons, defendants' motion to suppress the tower dump information [Dkt. # 167], which was obtained pursuant to a search warrant authorized by a Magistrate Judge in accordance with the Fourth Amendment, will be **DENIED.**


AMY BERMAN JACKSON
United States District Judge

DATE: August 19, 2025

15